Good morning everyone. You may be seated. So do we have a student group here today as well? Do we have a student group? Where are they from? Where? All right. So I want to welcome the students from Saratoga High School and we will take the cases up in the order in which they appear on the docket. We've submitted one case previously, Citizens for Fair Representation v. Padilla. So let's start with Ostray v. McQuaid. Good morning, Your Honors. May it please the Court, Matthew Witteman on behalf of Appellant Kerline Astre, I do want to reserve, with the Court's permission, five minutes of time to reply to Respondent's arguments. You may. Watch your clock. Just watch the clock. I will. Another preliminary matter, Ms. Astre did not contest the trial court's determination with respect to supplemental jurisdiction as it was based on the lack of federal claims and we would expect that should this matter be remanded to the trial court for purposes of adjudicating federal claims that the trial court would revisit that issue. We indicated that in our papers. So to get to more important matters, we believe that the Court rightly concluded that the facts, quote, the facts alleged here are sufficient to allege racial discrimination vis-a-vis Respondent McQuaid and we believe that, in fact, was confirmed by CALCASA in its citation of MAC for lack of diversity and structural discrimination and by the Board of Directors of MAC, which concluded that Ms. Astre was being discriminated against by the Respondents. Let's say that's true and certainly the pleading suggests that it is. Here you have alleged a 1981 discrimination complaint based on retaliation, harassment, constructive discharge against the defendants, but none of the defendants was her employer and you don't contend that the former employer is liable for any of this. So how do we connect those dots? Well, so, Your Honor, I think it's reasonably clear, both under 1981 by its own terms and the case law that has been established under 1981, that initially there is no requirement that a defendant have a contractual relationship with a plaintiff to be liable. The cases are fairly abundant in that regard. And what is our case to that effect? I know there are some in the Third and the Fifth and other circuits. What is our case to that effect? Well, for example, the Fobbs case, it's a case that involved, I believe, 25 members of a hospital committee that were not in a contractual relationship with the plaintiff there that at least, as far as that can be told from the opinion, were held potentially liable for the discrimination that was alleged there. Under 1981 or something else? Under 1981, I believe. So your claim is that these various people who weren't, many of them weren't even on the board. They were supporters. They were sponsors, if you will. You're claiming that they are liable for the actions of the employer who you don't sue for terminating your client based on racial animus. Is that right? That is right, but it is an extremely unusual circumstance here. We essentially, if you corporate takeover by the volunteers, many of them who were highly placed and well-funded, and they essentially staged a coup and disrupted the normal processes of this corporation and caused the termination of Ms. Astry. It was fairly clear under the Staub case and the Charter of Communications case, which I think your Honor authored, that there is liability if the adverse action is the intended consequence of the tortfeasor's discriminatory conduct, even where involving subsequent acts or decisions of third parties. That's the Staub case, Supreme Court case, the cat's paw theory. You mentioned that your client was terminated, but didn't she resign? She did resign, but your Honor, if, as I think the facts bear out, Ms. Astry's resignation was in fact the intended and necessary consequence of a withdrawal of support led by McQuaid that incapacitated MAC, Marin Advocates for Children. If there's no employer, there's no employment, resignation necessarily follows, and I think the cases are fairly legion that if a reasonable person would resign under the circumstances, that is constructive termination, and here there was no option. It wasn't just a question of reasonableness. I guess what troubles me is this. Your characterization of Ms. McQuaid, of course, is a diabolical one. I don't know, the lady, she may be a really wonderful person or she may not be, I don't know, but it seems clear from the pleadings that she was, if not the major sponsor or source of the entity's money. What you seem to be saying is that because she didn't like your client, she tried to get the company not to hire her in the first place, even though she was not personally successful in getting the board to terminate her, she just stopped funding, and you seem to be saying that she has violated 1981 because she made that choice, because she had racial animus. Is that correct? Yes, that is correct, and given all of the actions that she took, you have to, it's important to remember that Ms. McQuaid effectively assumed a leadership and spokesman's role in that November 14, 2016 meeting between Ms. McQuaid and Ms. Astry. She specifically vowed to cause Ms. Astry to fail. She clearly didn't like her, but I guess what I'm troubled with is this. I mean, this city, Los Angeles, almost any big city, you'll have wealthy patrons and patronesses who sponsor non-profit organizations that they think are really good. Sometimes they don't like people who are employed there, or they don't continue to like them, and they try to get them released or to depart. In this case, Ms. McQuaid is alleged to have done everything she could to get her to get fired. She wasn't successful. She tried to stop her from getting hired. She wasn't successful, but eventually when she stopped funding, then your client decided to quit. No, she wasn't getting paid, right? I mean, when Ms. McQuaid stopped funding MAC, it started lacking the resources to pay your client, right? That's right. I mean, essentially, one thing led to another, and there were reasonably foreseeable consequences to the orchestrated withdrawal of support. The intent was clear. And what is important to remember here is that we have a direct line from protected action on the part of Ms. Astry. From protected action, steps she took to prevent future racial discrimination and to integrate MAC, a direct line between, excuse me, go ahead. It's all true. I'll take that as true, just as you have pled, but it still gets down to the fact that Ms. McQuaid and others that she was able to convince did not like your doing. Now, you might say, well, that's discriminatory. But the reality, what you seem to be saying is that she's going to violate 1981 if she doesn't continue to fund an organization that is by then headed by someone who's taking the organization in a direction that she doesn't like. Is that your position? No. Well, I mean, yes and no. I would say I'm trying to be as direct as I can be. If and as your as your honor has indicated, if some significant portion of the rationale for her conduct, Ms. McQuaid's conduct and her attempt to cause Ms. Astry's failure was racially animated or retaliatory, even if there are other reasons, that is sufficient to state a claim under 1981 under charter communications. I know that case very well. I understand. But I, Chris, we have very different facts there. And what, again, what I'm concerned about here is it seems that you could be, if you will, creating a cause of action against almost every major individual funder of charities in perhaps the United States, because none of them is perfect. Some of them may have racial animus. They may not voice it like Ms. McQuaid allegedly did. But it seems like you're creating a very difficult situation here. I just, I understand the concept of basically a racially based intentional interference, atrocious interference with a contractual business relationship, which seems to be the racial animus alone and decides not to fund. That troubles me. I don't think the case law goes that far, does it? What were your state claims? Are one of them intentional interference with contract? That's right. And another important thing to remember here is that one of them was intentional infliction of emotional distress. So to me, why wouldn't you pursue those in state court? Because we believe very strongly there are strong federal claims here. It wasn't just Ms. McQuaid acting in isolation. She stated very clearly that she was acting on behalf of the Marin CASA Association, and she intended to cause Ms. Astry to fail. And she recruited other CASAs to that end and was successful. I think the fact that I'm stumbling over is the whole time. I mean, she didn't want Ms. Astry to be hired. The MAC Board hired her anyway. She wanted to get Ms. Astry fired and MAC Board rebuffed all of her efforts to do that. So the MAC Board itself was protective of Ms. Astry. They didn't respond. They finally responded because Judge Woods removed their CASA designation and gave it to someone else. The final result that was sought under the STAWB principle, the final result that was sought, was the termination of Ms. Astry's employment by way of resignation, by way of dismissal by MAC. And when those didn't work, the respondents turned to Judge Woods. I do want to make, I'm running out of time here, I do want to make a couple of other important points. One is that we do now have a California Court of Appeal decision. And I asked for judicial notice. We think that this is collateral estoppel on an important issue before the court with respect to a hostile environment. Collateral estoppel? Yes. It's a different claim, but there's issue preclusion. And what the court determined was this very same nexus of facts, this extended campaign of exclusion and subordination and abuse, Ms. Astry sufficiently pled that claim and proved a prima facie case. And that necessarily means that hostile environment was shown here. So we think that there's potential collateral estoppel and supplemental briefing is in order. And perhaps I should stop now. What is the name of the case? We included it in the I understand that. I'm asking you, what's the name of the case? Yes. The name of the case is, it should be  published. Yes. Well, actually it's not published, but it's binding between the parties. Was she a party? She was. Ms. McQuaid was a party and Ms. Astry was a party and it's Astry v. Susan McQuaid, California Court of Appeal, number eight. How did that involve, I'm sorry, say the site. I mean, I have it in front of me, but say the site. Yes. It's an unofficial, let's see, the site. And this is based upon tortious interference? No. Intentional affliction of emotional. Emotional harm. Based on these same acts that are alleged to be the harassment and hostile environment, the very same acts, and the California Court of Appeal actually decided they were racially, in part, that they were racially motivated and they represented an intentional affliction of emotion. So your client has achieved a remedy, has she not, through the state? Well, that remains to be seen. The principal reason we came to the federal court is that we believed that Ms. Astry, Ms. Astry had substantial federal claims that these claims were being swept under the rug, as it were, and that she, the federal courts, would protect her rights and render justice. So wait a second. And not forget what had happened to her. Counsel, the posture from the other case was Astry filed a complaint against McQuaid. McQuaid sought to have it dismissed under the Anti-SLAPP Act. Correct. And the Court of Appeals said that it could not be dismissed under the Anti-SLAPP. So the case is going forward. No. So what happened is, in this case, Astry versus Susan McQuaid, it actually was originally called Marin Advocates for Children versus Susan McQuaid et al. There was this case filed by prior counsel. I voluntarily dismissed it and moved the case to federal court. Under the SLAPP statute, the defendants are entitled to seek their attorney's fees. They sought their attorney's fees, and a determination on the merits must be made to award attorney's fees. And so that's what we have here, a determination on the merits. Wait a second. So what is the relevance of the case, then? The relevance of the case is that it has been established now, conclusively established, that Ms. Astry has adequately pled and proved a prima facie case of intentional infliction of emotional distress, which necessarily includes a finding of hostile environment. So why did you dismiss that case when you already established that instead of pursuing it? Well, what happened, Your Honor, is I voluntarily dismissed that case, and then this case actually had been filed a little bit before that dismissal. So that case was gone, and this case proceeded. And meanwhile, there was fee litigation in the California case over whether or not the defendant was entitled to fees. So you're not concerned about Ms. Astry. You're concerned about fees. Is that right? No, I didn't seek fees. Another attorney. Yeah. But you dismissed this case, the state case. I dismissed the state case. I actually offered to pay his fees, but we needed to litigate it. And so we litigated it, and now we have this decision, and it's in my view. Was it adverse to Astry? Sorry? Was it adverse to Astry? The trial court's decision? No, the court of appeals decision, the one you want us to take judicial notice of. Yes. No, it's actually in Ms. Astry's favor in substantial part. And it held what? It held that Ms. Astry had adequately pled and proved a prima facie case of intentional infliction of emotional distress based on these very facts before this Court, that eight-month period of insubordination. She pled it. She didn't prove it. The court below undoubtedly denied the demur. The court of appeals upheld it, right? Well, in SLAPP litigation, you must make a prima facie showing, an evidentiary showing. And so it went beyond the pleading. So it was remanded back to the trial court, and then you dismissed it. No, no, no. It was first dismissed. And then the trial court held as a sort of continuing jurisdiction to award attorney's fees, even with a dismissal. All right. You're well over your time. Yes. Okay. We'll hear from the other side. Thank you. Thank you. Good morning, Your Honors. May it please the Court, Peter Finn on behalf of Appellee's Susan McQuaid, James Finley, and Marin Casa. Counsel and I have agreed to divvy up our 15 minutes. We know that. We have the times. Just proceed. I wanted to first clear up a couple things that were mentioned in opposing counsel's presentation. The Fobbs case was referenced. There was a 1981 claim in that action, but it was barred by the statute of limitations. So it doesn't have any relevance to the facts here. The State Court of Appeals decision simply held that Ms. Astrey had met her burden to defeat an anti-SLAPP motion. So, okay, it held that. Then what? Nothing's happened yet on that. Would it not have been remanded to the trial court for the trial to proceed? What happened is it's been remanded to the trial court for the trial court to make a decision as to the appropriate reduction in fees. And counsel and I have stipulated to that, and we, I think, recently obtained an order to that effect. Nothing else has happened because counsel dismissed that case prior to the fee motion being brought by us. That's what I don't understand. It's an issue in the anti-SLAPP case law where even if a case is dismissed before a hearing on the anti-SLAPP motion, the defendants can still seek their fees for – But defendants wouldn't be entitled if Astrey, as the Court of Appeals held, she made a prima facie case. There were other claims as well. There was an invasion of privacy claim against Ms. McQuaid, which the Court of Appeals did not touch. There was a defamation claim by Ms. Astrey against James Finley, which the Court of Appeals did not touch. So there's still fees as to those claims awarded to defendants. So I just wanted to clear that up briefly. And just for clarification, opposing counsel suggested that because it was a SLAPP proceeding, that somehow the merits and facts of the case were weighed and litigated by a court. Is that correct or incorrect? There is some evidentiary evidence presented, but it's not a trial on the merits, I don't think. And it's not a determination that Ms. Astrey has proven her intentional infliction of emotional distress claim. So going to this matter, it's been acknowledged that the facts of this case are unique. There's no precedent for extending federal civil rights liability under 1981 or any of the other federal claims presented here. The relationship between the parties, Ms. McQuaid and Mr. Finley as volunteers of a nonprofit organization run by plaintiff, and Marin Casa as a separate entity that didn't even exist during the time period in question, and the significant attenuation between events makes her claims implausible as determined by the district court. There's no authority for stretching Section 1981 as far as Ms. Astrey seeks to do so here. The same is true for her other federal claims. And there's certainly no authority for the effort to impose successor, integrated enterprise, alter ego, or agency liability on Marin Casa. Let me ask you this. There are other circuits that have extended the application of 1981 to non-employer situations. Do you agree with that? There are circumstances such as the Ku Klux Klan case. That case is interesting, though, because that was a preliminary injunction case, number one. Also in a footnote, the court mentioned that the defendants did not even raise the employer employment issue at all. That would need to be fully briefed at trial at the merits. So I don't think it goes as far as it seems at first blush. A fact here that I think is critical is Ms. Astrey's admission that her employer, MAC, did not breach obligations to her. It's undisputed. It's an admission. I think it's pertinent because there's some striking parallels to the Domino's Pizza v. McDonald case, where the Supreme Court upheld the district court's granting of a motion to dismiss the 1981 claim. In Domino's Pizza, there were several contracts between the plaintiff's corporation and the defendant. And the plaintiff claimed that the defendant broke those contracts due to racial animus towards him. Sort of like Judge Wood decertifying MAC here. And as a result, the plaintiff's corporation filed for bankruptcy, kind of like MAC dissolving and winding up its affairs. But the Supreme Court held the plaintiff had no standing to bring this 1981 claim because there was no contractual relationship. Notably, in briefing before the Supreme Court, the plaintiff in Domino's Pizza introduced the argument that the defendants had interfered with his own contract with his corporation. The Supreme Court in footnote 4 rejected that argument because plaintiff had acknowledged that his corporation, quote, did not breach any contractual obligations to him. It's the same thing that we have going on here. And as to Marin Casa, it's not plausible. As to Mr. Finley, it's also not plausible. There's no facts to support those claims. I'll submit on that. Thank you. Thank you, counsel. Good morning, Your Honor. Seth Gordon on behalf of Defendant Appellee Beverly Wood, who, as the court knows, was the presiding juvenile court judge for the County of Marin at the time of the events in this case. There are two claims against Judge Wood that are at issue in this appeal. The first is under Section 1986 for the failure to prevent the racial conspiracy alleged in this case. The second is an unspecified 1983 claim. And before addressing why those claims were properly dismissed by the district court, I'd like to first point out some of the concessions and admissions that were made by plaintiff below and to this court because they defined the scope of the claims against Judge Wood. And the reason I bring this up, Your Honor, is because if you look at the third amended complaint, it's not really clear exactly which claims or allegations are being asserted against Judge Wood. And I would say that the same held true in the second amended complaint. And when we moved to dismiss that pleading, we moved on the 1981 claim, the 1985 claim, and a procedural due process claim that was also asserted against Judge Wood. In response to that motion, the plaintiff expressly conceded that she was not bringing a racial discrimination claim against Judge Wood, she was not alleging that Judge Wood was part of this race-based conspiracy, and she was voluntarily dropping her procedural due process claim. And I think this is important because under this court's ruling in Walsh v. Nevada Department of Human Resources, when a plaintiff voluntarily disavows claims, they can't be reassuscitated in the appeal. Turning to the 1986 claim, and I apologize for speaking fast. I've never had to do an argument before the Ninth Circuit in four minutes. As stated in our briefing, plaintiff was required to plead three elements. The first is she had to plead the existence of an actual race-based conspiracy. The second is that Judge Wood had actual knowledge in time to prevent the conspiracy. And the third element is that Judge Wood had the authority to prevent the conspiracy. As to the first element, I know that my colleague, Mr. Finn, has briefed that issue. Judge Wood briefed that issue. I would just say that there were not plausible allegations of a conspiracy in this case. And if plaintiff hasn't pled a conspiracy, she can't proceed under 1986. As to the second element, plaintiff was required to plead actual knowledge on behalf of Judge Wood. And if you look at the allegations from the Third Amendment complaint, the plaintiff describes an eight-month campaign between April of 16 and December of 2016 in which the volunteers engaged in wrongdoing. And I would say that when you look, well, so for instance, paragraph 16 of the Third Amendment complaint says the goal of this alleged conspiracy was to, quote, destroy max independence and ability to function. Now, she alleges that that was complete by December. The only allegation that's directed towards Judge Wood is in paragraph 45 of the Third Amendment complaint, and there's no allegation that Judge Wood knew that any of this stuff was going on until she approached Ms. Astray in January and informed her that because of lack of community support and because of the admission that MAC was no longer functioning, that she was going to withdraw CASA designation under the California rules of court. At that time, it's alleged that Ms. Astray said, these complaints that the volunteers are making are based on race. And it's actually alleged in the complaint that Judge Wood told Ms. Astray, you know, I'm not making any determination on the validity of these complaints, but the lack of community support is enough to decertify under the rules of court. So there's no actual knowledge. The third element, Your Honors, is the power to prevent. Plaintiff makes a conclusory allegation that Judge Wood somehow exercised power over the operation of MAC. I would say that that's a conclusory allegation. Judge Wood's authority to do anything with the CASAs was defined by virtue of California rule of court 5.655, and in that rule, the only authority that Judge Wood had was to certify CASAs or to remove volunteers in the courtroom setting. But the authority to supervise volunteers generally was, by rule of court, delegated to the program director. So there's no authority. I mean, Judge Wood could not have walked into MAC and somehow told these volunteers who were allegedly misbehaving to stop. Your Honor, there's a lot of other issues that are involved. I'm out of time. If the court has no other questions, I'll submit on that. All right. Thank you, Counsel. Ms. Lang? Good morning, Your Honors. Shirley Wong. I'm appearing on behalf of Defendant Pelley, California CASA. I will have to be brief as well with only four minutes, so I'm going to turn specifically to the only two specific claims alleged against CALCASA. That has to do with Section 1983 and Section 1986. First of all, Section 1983 requires that a person has to act under a color of state law, and significantly, Plaintiff has not pled any facts that CALCASA was a state actor or acting under a color of state law. CALCASA is a nonprofit entity that provides assistance and training to local CASA programs, basically as a subject matter expert. Plaintiff herself has admitted in her third amended complaint that CASA, working in conjunction with the California Judicial Council and Judge Wood, has the purpose of furthering the advocacy of at-risk youth. And so Plaintiff has conceded also in the complaint that CALCASA was not a bad actor. CALCASA had no racial animus. Does CASA's work with courts, though, the volunteers' work with courts? Work in a very loose sense in terms of as an advisory role in terms of being a subject matter expert on CASAs and also networking with local CASA programs and being available for consultations by the specific CASA programs and providing training as well to the CASAs. Then why do the courts have to certify the CASAs? Well, the CASAs being—well, it's governed by California Rural Corps 5.655 in terms of what all the CASAs have to comply with and all of that and being subject matter experts. CASA specifically is just available in an advisory role. In CASA, the CALCASA is not written into the statute. So there's no direct link there in terms of being a state actor or under color of state law. If you just focus on the specific factual allegations against CALCASA, in essence, Plaintiff is arguing that there was a racial conspiracy to oust Plaintiff from her job with her employer, that somehow CALCASA knew about it and failed to do anything, failed to prevent it. And that, in essence, is a Section 1986 claim that she has reasserted that that's the only one raised against CALCASA. Confusingly, she put in the Third Amendment complaint listing Section 1983 against CALCASA, but just like with Judge Wood, Plaintiff already conceded and withdrew the Section 1981 claims against CALCASA, Section 1985, and the only thing remaining was a failure to act. If you also look at the allegations against CALCASA, turning to the Section 1986 claim, if you look at what is pled in the entirety of the complaint, CALCASA did not know of any racial animus, and certainly the only reasonable inference that can be inferred is that to the extent CALCASA was involved at all, it had previously supported Plaintiff in her efforts to diversify MAC. The Third Amendment complaint specifically says that for the first six months, from April to October of 2016, CALCASA supported and approved of Plaintiff's efforts to diversify, and only when it changed course in the support and sought the dismissal of MAC, in which case MAC did not listen to CALCASA, even if that were alleged, even if we take true the allegations in the complaint for purposes of 12b-6, which we denied. But even if you accept that, if they previously supported her and then turned course, then the only reasonable inference to be drawn by that is that the change in position had nothing to do with racial animus. And so with respect to the other factor of Section 1986 that we addressed some in the briefing was that there was no authority or power to act in terms of the constructive termination of Plaintiff. Again, this case, as all of you have pointed out, is really an employment discrimination case. She has not sued her former employer, and she's seeking an employment-related recourse, a remedy with novel claims under federal civil rights acts that this circuit has not adopted in terms of the extension. Thank you very much. I'll give you two minutes. Thank you so much for your indulgence. Very, very quickly, a couple of sites with respect to 1981 liability in the Ninth Circuit. Scott v. Ross, 140 F. 3rd, 1275-1285. The Fobbs case actually holds that there's a 1985 conspiracy claim against these physicians in this supervisory committee under 1985-3. So that's the Fobbs case, 29 F. 3rd, 1439-1448-49. And we cited the Belle v. Clackamas County case upholding a jury verdict imposing individual liability on Section 1981 retaliation claim. Again, in the Ninth Circuit. This case really is not just about personal differences and the fact that Ms. McQuaid may not have liked Ms. Astry. It's about retaliation, and it's about the burden of proof. What we need to plead to plausibly suggest a right to relief and the right to discovery at this point, and I think that we have done that given the tight line, the tight line, and actually the expressive mission by Ms. McQuaid that she was in fact retaliating for protected action, for steps to integrate and prevent future discrimination at MAC that were approved by... If her allegations were against her employer, you'd be dead on. The problem I have is she wasn't her employer. She was a sponsor. She did everything she could. I'm talking about McQuaid. She did everything she could to get MAC to fire and originally not hire your client. She was not successful. She ultimately decided not to fund it, and that's a whole different ballgame than these cases that you cite. But she was successful in killing MAC. Because she didn't fund it. No, not just her, everyone else that she recruited. And it's like, Your Honor, and this is the last thing that I will say, imagine if you have a mutinous crew on a ship. They mutiny. They take the ship. They rename it. I don't think there's any court in the United States that would not impose liability on that crew. That is exactly what happened here. McQuaid and others destroyed MAC. It was a corporate takeover. They destroyed it. There was no MAC left for Ms. Astry to sue. And without her money, it wouldn't have existed in the first place. Well, her money helped, but there was a lot of money that came from, this is another part of this case, came from federal grants and other places that were required to run, that was required to run MAC. Thank you very much. All right. Thank you, Counsel. Astry v. McQuaid is submitted.
judges: Wardlaw, M. Smith, Bumatay